UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

|  |  |
|---|---|
| In re:<br><br>　　　AMY F. DIAMOND,<br><br>　　　　　　　　　　Debtor.<br><br>　　CASSOUTO-NOFF & CO.,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>　　AMY F. DIAMOND,<br><br>　　　　　　　　　　Defendant. | Chapter 7<br>Case No. 21-30453-EDK<br><br><br><br>Adversary Proceeding<br>No. 22-3004 |

**MEMORANDUM OF DECISION**

Before the Court, after trial, is a complaint filed by judgment creditor Cassouto-Noff & Co. ("Cassouto-Noff") against Amy F. Diamond, the debtor in the underlying bankruptcy case (the "Debtor"). In this adversary proceeding, Cassouto-Noff seeks a ruling that a judgment entered in favor of Cassouto-Noff against the Debtor is nondischargeable pursuant to § 523(a)(2)(A) of the United States Bankruptcy Code (the "Bankruptcy Code" or the "Code")[1] as a debt incurred for services obtained by false pretenses, a false representation, or actual fraud.

---

[1] *See* 11 U.S.C. §§ 101 *et seq.* All statutory references are to provisions of the Bankruptcy Code unless otherwise noted. And, unless otherwise indicated, all references to the "Rules" or "Bankruptcy Rules" are to the Federal Rules of Bankruptcy Procedure.

1

The following constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

I.    FACTS AND TRAVEL OF THE CASE

The Court's findings of fact are based on trial testimony, the admitted evidence, and the Court's own records.[2] *See LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.),* 196 F.3d 1, 8 (1st Cir. 1999); *Currie v. Wells Fargo Bank, N.A. (In re Currie)*, Slip Copy, Bankr. No. 11-17349-JNF, Adv. No. 12-1009, 2013 WL 1305805, *1 n.1 (Bankr. D. Mass. March 28, 2013) ("The Court may take judicial notice of the documents in the debtor's file and those in the Court's own records."). The Court particularly incorporates pertinent facts from the Findings of Fact, Rulings of Law and Order After Jury Waived Trial issued by the Massachusetts Superior Court in Cassouto-Noff's action to recognize and enforce a default judgment issued against the Debtor in Israel. *See Cassouto-Noff & Co. v. Diamond,* 1676CV0050, 2019 WL 11664765 (Mass. Super. Feb. 19, 2020).[3]

In 2012 and 2013, the Debtor, who had over 20 years of experience in investment banking with expertise in offshore oil and gas exploration, held executive-level positions in Bandel Green East Med Cooperatief U.A. and Bandel Interests, LLC (together the "Bandel Group"). The Bandel Group had an option to purchase 8% of certain oil and gas licenses held by ATP East Med Number I B.V. ("ATP") permitting oil and gas exploration in an area under the control of Israel (the "option rights"). The Debtor was also a managing member of Bandel East Med, LLC (collectively with the Bandel Group, the "Bandel entities"). The only asset owned by the Bandel entities was the

---

[2] Additional findings of fact are incorporated in the Discussion section, Part III, below.

[3] Exhibit 2.

2

option rights. Although the Debtor gained significant experience in the oil and gas industry while employed as an investment banker, the exploration project was her first opportunity to partake in potential profits from oil and gas production. In 2011, after its drilling operations revealed gas but at a lower than anticipated level, ATP had gone into bankruptcy in Israel and, in December 2012, its bankruptcy trustees sought to compel the Bandel Group to either exercise the option rights within seven days or lose them.

In need of immediate legal counsel in Israel to preserve the option rights, the Debtor contacted Meitar Law Firm, a large Israeli firm that previously represented the Bandel Group ("Meitar"). Meitar had a conflict of interest and referred the Debtor to Shmulik Cassouto ("Cassouto"), an attorney with Tel Aviv-based Cassouto-Noff specializing in civil and commercial litigation. An attorney with Meitar first spoke with Cassouto about potentially representing the Bandel Group and provided some general information about the Israeli bankruptcy matter. The Debtor then called Cassouto. During their initial conversation, Cassouto chose not to discuss the Bandel Group with the Debtor or determine which specific company agreed to pay the legal fees. Cassouto says this was because the Debtor stated that "I am Bandel," which Cassuoto states that he understood consisted of a large conglomerate of companies, and that the Debtor would be personally responsible for paying the legal bills. The Debtor accepted Cassouto's offer to represent the Bandel Group on an hourly basis, and Cassouto-Noff began rendering legal services on December 12, 2012. In actuality, none of the Bandel entities had any cash at the time Cassouto-Noff was retained.

Thereafter, Cassouto and the Debtor communicated numerous times, primarily by phone and email, and met in person in Israel in February 2013. Acting on behalf of the Bandel Group, the Debtor signed a written fee agreement with Cassouto-Noff for legal services related to the

3

option rights, which the Debtor sent to Cassouto-Noff in early February 2013. Later in February, Cassouto-Noff sent a bill for the majority of legal services that it rendered to the Debtor because, according to Cassouto, the Debtor was the firm's client. After the Israeli bankruptcy court rendered a decision in favor of the Bandel Group preserving its option rights, Cassouto-Noff sent a subsequent bill for additional fees to the Debtor in March 2013. Despite its requests for payment and threats of litigation, Cassouto-Noff's efforts to collect its fees were unsuccessful. The Debtor's last communication to Cassouto-Noff was in August 2013, when the Debtor indicated that new terms had been set with a new operator/driller and contracts were expected. However, the project ultimately did not continue due to the subsequent failure to obtain, after six to eight months of effort, the necessary approvals from the Israel Ministry of Oil and Gas. Bandel East Med, LLC, the Bandel entity that ultimately held the option rights that Cassouto-Noff helped preserve, filed a bankruptcy case in the District of Texas in 2015.

In December 2014, Cassouto-Noff commenced a lawsuit in the Tel Aviv-Yaffo Magistrates Court (the "Israel Court") against the Debtor and the Bandel Group for unpaid legal fees, and in October 2015, the Israel Court issued a default judgment and ordered the Debtor to pay Cassouto-Noff the amount of 311,817 in Israeli New Shekels with interest, as well as legal and court fees (the "Israeli judgment"). In February 2016, Cassouto-Noff filed a complaint against the Debtor in the Massachusetts Superior Court (the "Superior Court") seeking to recognize and enforce the Israeli judgment under the Massachusetts Uniform Foreign Money-Judgments Recognition Act, M.G.L. ch. 235 § 23A. In response, the Debtor raised various defenses, including that the Israeli judgment holding her personally liable for Cassouto-Noff's fees is repugnant to public policy. Following a bench trial, the Superior Court found that the Israel Court's decision to pierce the corporate veil was not repugnant under the facts of the case and recognized the Israeli judgment,

4

allowing it to be enforced.[4] *Cassouto-Noff*, 2019 WL 11664765. Notably, the Superior Court specifically credited Cassouto's testimony and found that the Debtor repeatedly stated that "She was Bandel" and that she would be personally responsible for and agreed to pay Cassouto-Noff's legal fees. *Id*. at *3. The Massachusetts Supreme Judicial Court affirmed the Superior Court judgment recognizing the Israeli judgment, which remains unpaid. *Cassouto-Noff & Co. v. Diamond*, 170 N.E.3d 319 (Mass. 2021).

On December 14, 2021, the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code. On Schedule E/F filed in the main case, the Debtor listed a claim held by "Cassout[o] Noff & Co." for "Judgment of payment of legal fees of the Bandel Group" in the amount of $175,767. On April 27, 2022, Cassouto-Noff filed the present adversary proceeding requesting a determination that the judgment debt to Cassouto-Noff is nondischargeable pursuant to § 523(a)(2)(A).

A trial was conducted on July 31, 2023, at which two witnesses appeared – the Debtor and Cassouto. At the conclusion of trial, both parties were given an opportunity to file post-trial briefs, which they have done, and the matter was taken under advisement.

II.  POSITIONS OF THE PARTIES

In the complaint and its post-trial brief, Cassouto-Noff contends that the Debtor purposely induced it to render legal services to the Bandel Group without a retainer by assuring Cassouto that she "was Bandel" and would and could pay Cassouto-Noff's legal fees without any intent to do so. Cassouto-Noff argues that its reliance on the Debtor's statements, as well as non-disclosures

---

[4] Acknowledging that Cassouto-Noff's claim was for breach of contract, the Superior Court did not make findings of fraud, despite Cassouto-Noff's suggestions to the contrary in the Complaint.

5

regarding the financial circumstances of the Bandel entities, was justifiable and that this Court should therefore find that the Debtor's obligation to pay Cassouto-Noff's judgment debt is excepted from discharge pursuant to § 523(a)(2)(A). At trial, Cassouto explained that he was surprised to learn during the Superior Court trial that, other than the option rights, the Bandel entities had no assets, funds, or bank accounts, and he would have likely requested a retainer or some contingency agreement if he had that information. Referencing *Kannavos v. Annino*, 356 Mass. 42 (1969), Cassouto-Noff also argued at trial that under Massachusetts law a half-truth can constitute a false representation and be as actionable as an outright lie in support of its request that this Court except the judgment debt from discharge due to the Debtor's failure to disclose that the Bandel entities had no capital, funds, books, or records and the Debtor was soliciting investors.

Despite the Superior Court judgment establishing the Debtor's personal liability for Cassouto-Noff's legal fees, the Debtor denies that she ever personally guaranteed payment. With emphasis on the circumstances resulting in the subsequent failure of the exploration project, the Debtor asserts that Cassouto-Noff has failed to prove that the Debtor knowingly made a false statement regarding ability to pay its fees at the time that Cassouto-Noff agreed to render legal services to the Bandel Group, let alone to show actual reliance on a false statement. The Debtor testified that Cassouto-Noff did not request that she provide either a personal guaranty or retainer and she offered neither. Denying any intent to deceive Cassouto-Noff, the Debtor states that Cassouto-Noff unreasonably relied on its own assumptions rather than requesting information regarding the Bandel Group to determine its ability to pay fees. Arguing that Cassouto-Noff is unable to satisfy its burden as to each of the elements required for a nondischargeability finding under § 523(a)(2)(A), the Debtor urges the Court to find in her favor.

6

III.    DISCUSSION

Section 523(a)(2)(A) excepts from the bankruptcy discharge any debt for "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). Accordant with the Bankruptcy Code's "fresh start" policy, the "[e]xceptions to discharge are narrowly construed . . . and, for that reason, the claimant must show that his 'claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a).'" *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997) (quoting *Century 21 Balfour Real Estate v. Menna (In re Menna)*, 16 F.3d 7, 9 (1st Cir. 1994)). "All genuine doubts should be resolved in favor of the debtor." *Weiss v. Fautz (In re Fautz)*, 636 B.R. 553, 565 (D. Mass. 2022) (citing *Palmacci,* 121 F.3d at 786).

In the complaint, Cassouto-Noff alleges that, in addition to the Debtor's false representations (discussed below), the Debtor caused Cassouto-Noff to render legal services through false pretenses and actual fraud by failing to respond to Cassouto-Noff's payment demands and threats of litigation directed to her personally. However, those particular arguments were not developed and are therefore deemed waived. *See Casanova v. Wyndham Grand Rio Mar Beach Resort & Spa*, 205 F. Supp. 3d 220, 237 (D.P.R. 2016) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.' The Court will not do counsel's work.") (quoting *Glob. NAPs, Inc. v. Verizon New England, Inc.*, 706 F.3d 8, 16 (1st Cir. 2013)) (internal citation omitted). And to the extent that Cassouto-Noff argues that the Debtor's radio silence constitutes a false pretense regarding her personal liability, the Court notes that this conduct occurred *after* services were obtained. *See* § 523(a)(2)(A) (a discharge does not discharge an individual debtor from a debt for services to

7

the extent *obtained by* a false representation). Consequently, the Court will consider only Cassouto-Noff's nondischargeability claim based on the Debtor's alleged false representations.

To except a debt from discharge under § 523(a)(2)(A), a creditor must establish each of the following elements:

> 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the false statement, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage.

*Sharfarz v. Goguen (In re Goguen)*, 691 F.3d 62, 66 (1st Cir. 2012) (citing *In re Spigel*, 260 F.3d 27, 32 (1st Cir. 2001)). Each element of a § 523(a) claim must be proven by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). And the creditor contesting dischargeability under § 523(a) bears both the burden of proof and burden of production as to each element. *Palmacci*, 121 F.3d at 787.

### A. The Debtor's Representation that "She was Bandel"

Cassouto-Noff asserts that when the Debtor represented that "[s]he was Bandel," *Cassouto-Noff*, 2019 WL 11664765 at *3, she agreed to be personally responsible for Cassouto-Noff's legal fees and promised payment of those fees when, in fact, she never intended to personally guarantee or pay the fees. According to Cassouto-Noff, the Debtor made this statement with the intent to deceive it into agreeing to render legal services to the Bandel Group (companies with no assets or ability to pay Cassouto-Noff's fees) without requesting a retainer and that Cassouto-Noff's reliance on her statement was justifiable and resulted in it performing significant legal work for which it was never paid.

In light of the Superior Court finding that the Debtor stated that "[s]he was Bandel" and is personally responsible for Cassouto-Noff's legal fees, the Debtor's protestations to the contrary

are irrelevant. The doctrine of collateral estoppel incontrovertibly applies in dischargeability proceedings brought under § 523 of the Bankruptcy Code. *Grogan*, 498 U.S. at 284 n.11. "As a result, where there has been a prior state court judgment, the bankruptcy court's ultimate dischargeability determination will be governed by any factual issues that were actually and necessarily decided by the [prior] court." *O'Rorke v. Porcaro (In re Porcaro)*, 545 B.R. 384, 395 (B.A.P. 1st Cir. 2016) (quoting *B.B. v. Bradley (In re Bradley)*, 466 B.R. 582, 586 (B.A.P. 1st Cir. 2012)). The Superior Court's determination that the Debtor is personally liable for Cassouto-Noff's fees and the Superior Court's finding that she made the statement that "[s]he was Bandel," (which was necessary to the court's decision) are binding on this Court. *Cassouto-Noff*, 2019 WL 11664765 at *3.

It is unnecessary for the Court to determine whether the Debtor knowingly made a misrepresentation as to her intent to be personally liable for the legal fees, as Cassouto-Noff has not elucidated why the Debtor's promise of personal liability induced it to render legal services to the Bandel Group. The parties had no relationship or interaction prior to December 2012, and Cassouto had no knowledge of the Debtor's financial circumstances. July 31, 2023 Trial Tr. 56:12-24, 59:3-7, ECF No. 41. Cassouto testified that he understood that the Bandel entities consisted of a conglomerate of companies experienced in the oil and gas industry, and that Cassouto-Noff prepared the written fee agreement in the name of the Bandel Group. Trial Tr. 15:21-24, 16:15-24. Critically, Cassouto-Noff has not argued that it would not have otherwise rendered legal services to the Bandel Group if the Debtor had not agreed to be personally responsible for its legal fees. Consequently, Cassouto-Noff fails to satisfy the fourth element, that it actually relied on the Debtor's promise of personal liability when it provided legal services to the Bandel Group.

9

To the extent that actual reliance was somehow established, however, Cassouto-Noff has also failed to establish justifiable reliance on any alleged misrepresentation as to the Debtor's intent to be held personally liable. Unlike the reasonable reliance standard, the justifiable reliance standard does not require the creditor to "prove that he acted consistent with ordinary prudence and care." *Sanford Institution for Savings v. Gallo*, 156 F.3d 71, 74 (1st Cir. 1998). Instead, "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Field v. Mans*, 516 U.S. 59, 71 (1995) (quoting Restatement (Second) of Torts, § 545A, cmt. b. (1976)). "Justifiability is not without some limits, however." *Id.* A creditor is not necessarily required to conduct an investigation, but must "use his senses." *Id.* (quoting Restatement (Second) of Torts, § 541, cmt. a. (1976)). And, in determining whether a creditor's reliance on a misrepresentation was justified, courts have considered the particular relationship between the creditor and debtor. *See Lentz v. Spadoni (In re Spadoni)*, 316 F.3d 56, 59 (1st Cir. 2003) (the parties' friendship and the creditor's trust in the debtor supported finding that a landlord justifiably relied on the representation of a tenant that the tenant would pay overdue rent despite the tenant's prior repeated, broken promises of payment); *Falcone v. Ragonese (In re Ragonese)*, 505 B.R. 605, 614 (1st Cir. B.A.P. 2014) (finding that creditors, after working with the debtor, a builder, on a somewhat completed home construction project they managed from afar for over a year and were desperate to make weather tight as winter descended, justifiably relied on the debtor's promises to work exclusively on their project site and apply the creditors' payments solely to the creditors' project); *Aoki v. Atto Corp. (In re Aoki)*, 323 B.R. 803, 816 (1st Cir. B.A.P. 2005) (finding that the creditor, who shared Japanese heritage with the debtor and was persistently subjected to the debtor's appeal to the creditor's belief in the "samurai spirit"

10

and its focus on keeping one's promise, reasonably relied on the debtor's misrepresentation of intent to comply with obligations under a licensing agreement).

Prior to his first conversation with the Debtor, an attorney with Meitar provided Cassouto general information regarding the Israeli bankruptcy matter for purposes of referring the Bandel Group to Cassouto-Noff for representation. When the Debtor then called Cassouto, they did not discuss the Bandel Group, its related companies, or which company held the option rights because Cassouto "didn't care," because he "understood" that the Debtor ran a conglomerate of experienced companies that specialized in the oil and gas industry. Trial Tr. 16:9-23. Admittedly, Cassouto knew nothing about the financial health of either the Debtor or the Bandel Group when he agreed to provide representation. Trial Tr. 59:3-7. Cassouto explained that in over twenty years of legal practice, he had never asked for bank records and instead relied on conversations with potential clients to determine representation terms. Trial Tr. 60:8-19. Here, Cassouto relied on his assumption that the Debtor would not need to set up a group of companies if there were no assets. Trial Tr. 24:19-20.

Cassouto-Noff has not alleged that the Debtor made any affirmative representations regarding personal or business assets other than the option rights. And this Court cannot ignore what Cassouto-Noff undeniably *did* know when it agreed to render legal services. The only asset that Cassouto-Noff had actual knowledge of was the option rights owned by a company that was part of a conglomerate that the Debtor held an interest in. While the Debtor promoted the venture and its potential, if successful, to generate millions of dollars, Cassouto knew that those option rights were jeopardized by the very bankruptcy proceedings that necessitated his legal services. Although Cassouto may have presumed his success in preserving the option rights, Cassouto acknowledged "in general, that oil and gas is something that is very risky." Trial Tr. 22:10-13.

11

Despite being aware of only one asset, which Cassouto knew was jeopardized and inherently risky, Cassouto simply assumed that as the head of a conglomerate, the Debtor had access to assets.

When Cassouto agreed that Cassouto-Noff would represent the Bandel Group, the parties were complete strangers to each other, having had no prior relationship or interaction. The parties shared neither history, heritage, nor country of origin. And unlike the creditors in the *Ragonese* case, who were desperate for the debtor to provide further services, Cassouto-Noff has not suggested any circumstance that would have pressured it to rely on the Debtor's promise of personal liability when it agreed to provide legal services to the Bandel Group. Here, it was the Debtor who was desperate for Cassouto-Noff's services and Cassouto-Noff had any leverage regarding the terms of representation.

This Court does not suggest that Cassouto had a duty to request bank account or other financial statements from the Debtor, but notes that Cassouto did not ask the Debtor, whom he was completely unfamiliar with, to confirm that she or the companies had assets available to pay its fees if the option rights were lost or not fruitful. Consequently, this Court concludes that any reliance on the Debtor's pledge of personal liability in agreeing to provide services to the Bandel Group was not justifiable in these circumstances, given Cassouto's admitted unverified assumptions regarding the ability of either the Debtor or the Bandel entities to pay the legal fees and Cassouto's failure to inquire further to confirm those assumptions.

B.    **The Debtor's Promise of Payment**

Cassouto-Noff has also failed to persuade the Court that the Debtor had no intention to cause the Bandel entities to pay Cassouto-Noff's legal fees at the time representation commenced. Generally, only statements of fact and not promises are actionable as fraud. *Rodowicz v.*

*Massachusetts Mutual Life Ins. Co.*, 192 F.3d 162, 175-76 (1st Cir. 1999). However, a "false representation as to one's intention, such as a promise to act," can constitute a misrepresentation under § 523(a)(2)(A). *Palmacci*, 121 F.3d at 786. The falsity or recklessness of the representation is evaluated at the time the representation is made. *Id.* (citing Restatement (Second) of Torts § 530(1)). If the debtor intended to perform at the time the debtor made the promise, "but subsequently decided that he could not or would not so perform, then his initial representation was not false when made." *Id* at 787. (citations omitted). "Simply breaking one's contractual obligations does not, therefore, evidence such fraudulent intent." *DeWitt v. Stewart (In re Stewart)*, 948 F.3d 509, 523 (1st Cir. 2020) (citing *Palmacci*, 121 F.3d at 787). And whether the debtor knew or should have known that the debtor could not keep the promise may be inferred "from the totality of circumstances, including from circumstantial facts and post-transaction conduct." *Id.* (citing *Palmacci*, 121 F.3d at 788-89, 792-93).

This Court credits Cassouto's testimony that the Debtor assured him that the firm's legal fees would be paid during the Debtor's initial call to him in December 2012 and, as a result, Cassouto-Noff's legal services promptly commenced. Based on Cassouto-Noff's invoices, it provided services during the period December 12, 2012 through February 19, 2013, the majority of which were rendered before the Debtor returned the executed, undated Fee Agreement to Cassouto-Noff. Ex. 5, 69-76. Pursuant to the Superior Court's findings of fact, the Debtor and Cassouto-Noff attorneys continuously communicated while the firm rendered legal services to the Bandel Group and the Debtor repeatedly stated that "[s]he was Bandel" and agreed to pay the legal fees. *Cassouto-Noff*, 2019 WL 11664765 at *3.

At the time of the Debtor's initial phone call with Cassouto in December 2012 and through February 19, 2013, while the Debtor communicated with the attorneys, the Bandel Group owned

13

the options rights. Having already personally invested five years of unpaid work in the Bandel Group's venture prior to ATP's bankruptcy filing, the Debtor attempted to recruit operators to assume ATP's interests and develop the leases as well as investors so that the project could continue. Trial Tr. 68:7-9, 81:3-5, 87:16-18. The Debtor credibly testified that if the oil and gas field had been developed, she hoped to receive $5 million *after* expenses, including Cassouto-Noff's fees, were paid. Trial Tr. 94:12-20, 98:2-11. In the Debtor's final communication and response to Cassouto-Noff's request for payment, the Debtor indicated that contracts with new operators were expected. However, the Debtor and the Bandel Group were unable to secure an operator that the Israel Ministry of Oil and Gas would approve, and Bandel East Med, LLC, an assignee of the option rights, then filed its bankruptcy case in 2015. In the end, the Debtor derived no money from the oil and gas licenses. Trial Tr. 90:14-16.

Based on her experience in the oil and gas industry, the successfully drilled well at the site, and the Debtor's subsequent efforts to bring in investors and new operators, Cassouto-Noff has failed to convince this Court that the Debtor knew that Cassouto-Noff's fees would not or could not be paid when she promised payment or that the Debtor made that promise in reckless disregard of the truth. To the contrary, this Court believes that the Debtor was not unreasonably optimistic that the option rights would ultimately prove to be lucrative and Cassouto-Noff's fees would be paid. The Debtor continued her efforts to develop the leases for many months after promising payment and until the Israeli government failed to approve proposed subsequent operators. Therefore, Cassouto-Noff has failed to establish by a preponderance of the evidence that the Debtor made a knowingly false representation or one made in reckless disregard for the truth. The Debtor did not know Cassouto-Noff's fees would not be paid and did not recklessly disregard the ability to pay its fees at the time that the Debtor promised payment. And because the Debtor

14

believed that the option rights could generate funds to pay Cassouto-Noff's fees, Cassouto-Noff has also failed to establish that the Debtor intended to deceive when the Debtor assured payment of its fees.

### C. The Debtor's Omissions

As an additional basis to deem its judgment debt excepted from discharge, Cassouto-Noff alleged at trial and in its post-trial brief that the Debtor misrepresented that its fees would be paid and induced Cassouto-Noff to render legal services by her omissions – namely, the Debtor's failure to inform Cassouto-Noff that the companies had no books, records, or assets (other than the option rights) and that the Debtor was soliciting investors for the project.

Under the common law theory of fraud and misrepresentation, there are two circumstances where failure to disclose material information may be actionable. First, failure to disclose may be actionable "when the defendant has a legal duty to do so." *Access Cardiosystems, Inc. v. Fincke* (*In re Access Cardiosystems, Inc.*), 404 B.R. 593, 643 (Bankr. D. Mass. 2009). Under Massachusetts law, "there can be no actionable claim of fraud for failure to disclose in the absence of duty to disclose." *Royal Business Group, Inc. v. Realist, Inc.*, 933 F.2d 1056, 1064 (1st Cir. 1991) (citations omitted). Cassouto-Noff has not identified any legal basis to support that the Debtor had a fiduciary or other affirmative duty to disclose the information it alleges was wrongfully withheld.

"The second type of culpable omission is one that renders an otherwise accurate statement misleading." *Access Cardiosystems*, 404 B.R. at 643. Regarding the Debtor's promise that Cassouto-Noff's fees would be paid, the Debtor credibly testified that she expected the fees would be paid from revenues generated from the option rights, not from business assets or by investors. Contrary to Cassouto-Noff's allegations at trial, the Debtor clarified that she sought to bring

15

investors into the project but not to take it over. Trial Tr. 96:22-23. Cassouto-Noff has failed to show that the lack of business assets and Debtor's solicitation of project investors contradict the Debtor's estimate that the option rights could be worth up to $100 million and generate millions of dollars in revenue from which Cassouto-Noff's fees could be paid. Neither omission impugns the Debtor's premise for promising payment or renders an otherwise accurate statement misleading. Consequently, the omissions that Cassouto-Noff has alleged do not constitute misrepresentations for purposes of § 523(a)(2)(A).

IV. CONCLUSION

The Court does not question that Cassouto-Noff was damaged by providing legal services to the Bandel Group on an hourly basis without a retainer and for which it has not been paid. Even if the Debtor misrepresented that she would be personally liable for Cassouto-Noff's legal fees, Cassouto-Noff failed to meet is burden as to actual reliance on this misrepresentation (as opposed to its own assumptions) and failed to counter its assumptions with the knowledge it did have or to inquire further, thereby rendering any reliance not justifiable. Regarding the Debtor's representation that Cassouto-Noff's fees would be paid, Cassouto-Noff failed to establish that the Debtor either knew her promise was false or recklessly disregarded the truth of that promise at the time it was made. Lastly, the Court does not find that the Debtor had an obligation to disclose that the Bandel entities had no books, records, or assets other than the option rights or that she was soliciting investors for the project.

Accordingly, the Debtor's judgment debt to Cassouto-Noff is not excepted from discharge pursuant to § 523(a)(2)(A) and the Court will enter judgment in favor of the Debtor. A separate judgment in conformity with this Memorandum will issue forthwith.

Dated: 1/30/2024

By the Court,

_____
Elizabeth D. Katz
United States Bankruptcy Judge

17